For today's case number 4-18-0733, this is the trust of Metz, for the appellant we have Mr. Radley, and then for the affilee we have Anna Frye, is that how you pronounce that?  Anna Frye, okay, thank you. And Ms. Casino? Yes. Okay. And Mr. Anna Frye, you will be arguing, is that correct? Yes. All right. Mr. Radley, you may proceed, sir. Thank you. May it please the Court, I'm David Radley, I'm an attorney from Peoria, Illinois, and I represent Adele Meyer, who is the only appellant in this case. This case concerns two trusts, as the Court well knows. One is the Edith Metz Trust, which was established in the 1950s, I think it was, in 1950. And the other is the trust established by her son, O.T. Metz, in the late 1960s, that was the Metz Mettery Trust. My client, Adele Meyer, was barred at the conclusion of trial court proceedings, including from receiving any Edith's trust or O.T.'s trust, because her mother, Eula, who was O.T.'s wife and sole heir, had signed the release of O.T.'s estate in 1969, 50 years ago. The trial court ruled that the release barred Eula from inheriting the estate property that passed through or by reason of O.T.'s death. That ruling appears on page 118 of the appendix. During the trial court proceedings, there were a number of defenses thrown out that were established to Adele's position, and I'd like to run through those before getting to the merits of the case. The first is the question of whether Adele has standing to appear in this case, and whether she was made a respondent by the plaintiffs, the trustees of both trusts, and that is the capacity in which she appears. She does have standing as Eula's daughter and the sole heir of Eula's estate. She is not appearing as a third-party beneficiary and does not claim to have standing by reason of that. The trial court did find, in its order on page 115 of the appendix, the trial court found that Adele was properly before the court and representative in the interest of Eula, who was deceased, and all of those who may claim by and through her, no appeal was taken from that order. So Adele clearly has standing in this case. The next thing that was thrown out for attempted defense was the argument that race judicata bars Adele because whether Eula had made a settlement with the executives of both chiefs of state, and that there was a court order that approved that settlement. However, race judicata does not apply because that would require an identity of parties and an identity of causes of action. There is no identity of causes of action between the 1960s proceedings in both chiefs of state and the current litigation. In the 1960s, when that matter was actually not litigated, litigation was threatened. But had there been litigation, it would have been a question of whether Eula had the right to renounce both chiefs of state and take the fourth chair of one half of the state because she was a civil lawyer and a widow of both chiefs. That is certainly not the cause of action that is in this case. In this case, the principal issue is the effects of the release of Eula that had signed 15 years ago. They're not the same operative facts or cause of action, nor is there an identity of parties. In the 1960s, the parties were Eula and the executors of both chiefs of state. No one in this current litigation has any direct connection to both chiefs of state or the executors of both chiefs of state. The next defense to Adele's position raised in the trial court was concerned with an antidoxial agreement. Now, all the parties agreed that there was an antidoxial agreement. However, we don't know what the terms of that agreement were.  We don't know why it's not in the record as part of the OD of state proceedings, and it's not in the record in any defense. Our works have gotten this file to describe the opinions of individuals as to what they thought of the agreement and what they thought it might contain. But those opinions would have been inadmissible if offered as evidence. And we suggest that the antidoxial agreement just cannot be raised as far to Adele's position at this point, because it's not in the record. And the final argument, procedurally, in an attempt to bar Adele from maintaining her position in this litigation, was the argument that if the release that you assign is to be set aside or disregarded, that, in effect, would be a rescission of the release which you signed. And if there were a release or a rescission of the release, the rescission ordinarily usually requires a return to the status quo ante of the parties. However, that would be a useless act in this case, because if the release were rescinded and if Adele hypothetically were to raise $50,000 and was paid to do it as part of the settlement plus interest, that money would have to be returned to her because the release would have been rescinded. And the following would echo the maxim that equity will not require the performance of a useless act. I think that applies to each particular case. Now, to the merits of the case, let me examine first the language of the release signed by Buehler. Both parties cited the case of Williams v. Swango, a 1937 U.S. Supreme Court case. In that race, in that particular case, there was a release and it was contained in two identical deeds. And if I may quote from those deeds, quote, Of course, they quote, Buehler, in 1968, Buehler threatened to renounce the Quotidien bill and take one-half of the business day as a forced share. The purpose of the release that she signed was to prevent her renunciation of the will. That was the primary purpose. In fact, there were five limitations in the release that she signed. One was renunciation of Quotidien's will. That was accomplished. She did not renounce Quotidien's will. The second reason for the release was to avoid claims made against Quotidien, things that he had done during his lifetime. That was not the purpose of the release. The third category was claims against O.T.'s executor. There were no claims against O.T.'s executor. The fourth was claims arising out of or connected with the administration of O.T.'s estate. There were no such claims concerned. And O.T.'s, the fifth was O.T.'s will, claims concerning O.T.'s will or devices or legacies. There were no such claims made. So it's clear that the five limitations contained in the release itself did not bar or release Buist's statutory right to inherit by O.T. Well, counsel, let's take a closer look at that release. The language includes the following that she is releasing, and I'm kind of paraphrasing, all of her interest in the estate of whatever name or nature of the same may be, and whenever so, situated except for the lifetime annuity in the sum of $750 per month. That's the language of the release, correct? Yes. And so this money that we're talking about funneled through the estate of O.T. as a result of what he received from Edith. Is that correct? Was it not part of his estate? Well, it passes by a statutory provision in the program, because it's intestate property. I understand that. I guess my point is, isn't it correct that when you talk about someone's estate, that's a pretty broad word? You know, it's not limiting. It's all-encompassing, their estate. And so I'm having difficulty understanding how Adele would be able to benefit from that if it is part of the estate, given the release that her mother signed. Well, the term estate, Your Honor, in that context can be read two different ways. One would be to read it as the probate estate of O.T. And the other would be not only the probate estate, but the probated inheritance tax return, the distributives, not only that, but any other rights, statutory rights, that might be triggered by the death of O.T. So we don't believe that that clearly applies to the inheritance of the intestacy. Counsel, if I'm understanding what you're saying, you define intestacy as a separate legal entity, as opposed to a condition of an estate. And I don't believe that's what intestacy means. Intestacy is just the condition of an estate. It's not a separate legal entity therefrom, is it? That's correct. Okay. So if it's just a condition of the estate, and the language of the release references, Beulah does hereby remise, release, acquit, and forever discharge the executors and the estate from any and all, from any and every claim, legal or equitable, arising out of or connected with the administration of the estate, or any of the devices and legacies made therewith. And it talks about releases and conveys the estate, all of her interest in the estate of whatever name or nature, the same may be, and wherever so situated. Why doesn't that conclude? Intestate estate. And I believe that gets to the next point of the argument, and that is the intent of the parties, the reason for making the settlement with Beulah, and the exact language of the claims. And it's our position that it can't be read two different ways. It can be read as applying only to the appropriate estate, or the known estate of O.T., or it could be applied to all statutory rights pertaining to the estate, or affiliated with the estate, the right to inherit by consent. Well, when she says in the release that she, in lieu of the $50,000, in lieu of renouncing the estate, in satisfaction of any and all claims or demands against O.T. in his lifetime, or against the executors of his estate since his death, after full and complete knowledge and opportunity of knowledge concerning all of the facts arising out of any rights or claims that Beulah might have after consulting with her attorney, how does that leave me now? Well, first of all, it is limited if we parse the language of that release. It precludes her from renouncing the will, and it precludes any claims against O.T. That would be the four things that O.T. did in his life. That was about that. It precludes any claims against O.T.'s executors. There was no claim to make against O.T.'s executors. It precludes claims arising out of the administration of the estate. There was no claim pertaining to the administration of the estate. It precludes any claims made concerning the will, O.T.'s will, or advises or licenses made in that will. It accomplished all of those things. But when it says arising out of any rights or claims that Beulah might have, how does that limit us? I believe that's the particular phrase that refers to the administration of the estate. And so it's limited to claims pertaining to the administration of the estate. We are not to make that decision at this point. We have no argument with the administration of the estate. We've been talking about the release. It's in conjunction, it's executed in conjunction with the settlement agreement. Your position is that there was mutual mistake of fact. And just looking at your reply brief, I think this is, I'll quote it, and then I think necessarily for your position to prevail, for your client to prevail, would have to be that we would accept this proposition. You indicated Adele seeks invalidation of the settlement based on the party's mistake when they assumed O.T.'s estate was, and this is the part I want to emphasize, and always would be worth no more than $850,000. I understand that at the time the settlement agreement was executed, I think the parties agreed that that was the value of his estate at that time. Is there anything in the record, either by way of the terms of the settlement agreement or something that's collateral to the settlement agreement, that indicated the parties intended that the settlement agreement was based on O.T.'s estate always being $850,000 or less? Yes, Your Honor. That would be two letters of correspondence from Eula's attorney to the executors in which they referred to the amount of, the value of both Eula's estate. One of the letters you sent them was surprised because it might even be over $800,000. Counsel, would you tell us specifically what the language is in the letters that speaks to the fact that they are contemplating that it won't be more than that at some point? Because the parties seemed to be in agreement at the time that it was around $800,000 when this agreement was entered and the release was signed and all that. So what we need to look for is something that indicates that if it somehow becomes more than that, then this release doesn't apply. What language in the letters speaks to that? Well, this appears in, two letters appear in pages 92 and 95 of the appendix, Your Honor. Those are letters from the attorney from California, Illinois, and Chicago to Eula's, to Otis' executors. And from reading those two letters and the nearness tax return filed by the executors, showing the estate was worth $848,000, which appears in page 101 of the appendix, it is clear from reading those that the parties did not anticipate that the estate would be any larger. I'm really confused because I don't see how you can come to that conclusion. All they're saying is this is what it's worth now. This is what the value of their various interests are now. But who in their right mind doesn't expect an estate to appreciate in value over time? Well, we're not talking about appreciation in value. We're talking about the infusion. It is primarily, it is the corpus, the corpus of the express. There's nobody in this case. But the point is, the point that I'm trying to make is, where in the letters does it indicate an intention on the parties to say, and if it goes beyond what we believe it to be today, for whatever reason, infusion, growth, then this does not, you know, it would not apply to that increase. This agreement, this release would not apply to that increase. I don't see that in those letters. Those letters just establish what the value was at that time. And one of the letters refers to the percent that the attorney said that the settlement amount of $50,000 was less than 12.10% of the value of the estate alone, which means that he was requiring that those be no mistakes. No, the parties did not specifically say, this is our belief that we believe that this is the value of OG's estate, and we believe that it would never be larger than that. No, they did not say that specifically. We're expecting them to have said that. And did they say anything to indicate that this is what we believe it's worth now, and if it increases this release, this agreement does not apply to those funds or that amount? No, but when there's a mutual mistake, the majority of the fact that, yeah. What was the mutual mistake? The ultimate value of OG's estate. Was it accurate that the value at the time that they entered the agreement was around $800,000? Yes, ma'am. At that time. So you're saying in hindsight, there was a mutual mistake? Because it changed from when they agreed? That's correct. In almost all mutual mistake cases, when the reasons were set aside by a reasonable mutual mistake, that's because the parties did not have the hindsight or the foresight at the time they made the settlement to anticipate. Certain facts that would occur in the future. This is what appears in personal injury cases where the leases are signed. In one case, there was a severe stroke that resulted from a minor injury. They didn't have the foresight to make that possibility. The appellate court said that release was not applied because the parties made a mutual mistake. I understand what you're saying, but in that situation, we're dealing with circumstances where there's a minor injury. They don't have a full comprehension of the repercussions of that injury. Here, we're talking about money. And does it prove that there was a mutual mistake, the fact that the money increased, but they were accurate at the time as it relates to the value of his estate? The mistake that they made was not anticipating the possibility of receiving a huge amount of money for Rita's process. Just as in the Korofsky case, there were a lot of cases where the parties decided to increase the price. I went through a real estate transaction. The appellate court said they set aside the provision concerning real estate taxes because they had made a mistake with the budget real estate taxes. That is something that occurred or came to light after the settlement. That has occurred in a number of cases. It's usually the fact that there was a mutual mistake, the fact that there were facts that occurred after the settlement. In this case, it was not an argument. In fact, the parties did not consider the possibility that there was an expectancy from either trust in the future. That was a mistake that they made at the time. They did not anticipate that possibility. That is apparent in the two letters that include those terms, and also in the inheritance tax return filed by the executives. All parties believe that the OTs trust in Rita's trust discloses all of their assets, and that was part of their assumption when they made the settlement. Counsel, I'm sorry. I've been so engrossed in your argument, I wasn't watching the timer. You're out of time. You will have additional time on rebuttal. Thank you. Mr. Onufry? Good morning, Your Honor. Charles Onufry, an attorney with Schneider Law Firm. I'm here before the court on a co-op teaching application. I appreciate the opportunity to appear before the court. There are two issues in the case. The scope of the release may preclude the claim that the release does not apply, and whether or not the release does apply should it be set aside for a mutual mistake. The essence of any settlement is finality. That's what people want when they enter into a settlement. They don't expect to hand over a check to the person receiving it and say, Thank you, and I may be back later in the morning. It's true in every settlement area of law, including estates. We know that estates can bear assets that are discovered later on. Claims are pursued, there are divergent interests. While this case certainly is unusual, it's not unheard of for an estate value to change. So you start with that premise that people are looking for finality. In this case, the claim that Buelow was naked in 1969 was against O.T.'s estate. She wasn't making a claim against just a particular piece of property, a particular aspect of the estate. It was unentitled to a portion of O.T.'s estate. She renounced the will. She was going to get one-half of the estate, which is all his property. That which is devised, that which is not devised. So that she chose not to pursue that claim does not illuminate the fact that she made a claim. And the claim that she pursued in this case is the same thing. It's a claim against the estate. The court had asked a question as to if Mr. Radley is treating the right from the test to see as a separate, substantive right. And he seems to suggest that in several places in the brief. He says, Buelow's statutory right to inherit and testate property would not be a claim against O.T.'s estate. We've said that several times. It doesn't cite anything for that proposition. We just don't see how that impossibility takes in as a claim against the estate. Then you get to the specifics of the petition, which has very broad language. And they ask for the order. It's for a full settlement of any and all claims which Buelow may have had, now has, or hereafter may have. You get the order that says Buelow is forever barred from asserting any claims. And that's an order that remains in place. It seems to us that she's got to set aside that order as well, which has never been set aside. And then the court went over the different language in the release. But there's actually one phrase that I always thought was sort of dispositive. It's the language that the court cited, but right before that, in that last paragraph, and releases and conveys to the estate of O.T. that all of her interest in the estate of her deceased husband, of whatever name or nation, she has conveyed her rights in the estate. We understand that a release may be worth it. But you have to have the rights to pursue it. She gave up that right. She conveyed that right. Mr. Bradley would say that that gets back, though, to the mistake of fact. And even granting the conveyance there, if there was a mistake as to the value of the estate, then it was ineffective, this conveyance, because it was a mutual mistake. I'm assuming your response is yes, but there was no mistake of fact here. And that gets into the later argument here about you can't claim a mistake of fact for something that's happening in the future in terms of appreciation. Eric? Exactly. I assume if you were to make that argument, certainly the mutual mistake of fact, if the court were to agree with that, that eliminates the release, certainly. But I guess my point is there shouldn't be an argument about the scope of the release, even because she has conveyed all her interest in the estate. I want to work backwards from this mistake of fact argument. If Adele was claiming that, and I know this isn't the situation, but that the value at the time of the agreement was based on the value of farmland, and there was an undiscovered oil reserve underneath, and that's what caused the inflated value at a later date, Adele would be in a much better position there claiming mistake of fact at this point. It's funny the court asked that example. It's actually one of the ones I was contemplating getting ready. The reality is when people release claims, they have to make all sorts of assessment of risk. And I'll give you an example. This gets the mutual mistake of fact. At the time this deal was done in 1969, and we don't know that this happened, but we don't know that it didn't happen, Adele's attorney would have explained to her, I'm sorry, Gill's attorney, would have explained to her, said, Hey, look, if you don't want to settle and they want to roll the dice and not settle, maybe you'll have the property, maybe you'll have the purse, and then maybe you stand to gain more. That's a pro and con. That's a, should I take the money now or should I roll the dice? And maybe that will happen. That's why that's, we agree it's not a mistake of fact. The mistake was worth it. The mistake was worth it at that time. This is failing to predict what is going to happen in the future. It's what business people do day in and day out. You can't go back to the person who made the deal with it because things in the future didn't unfold the way that you thought that they would. And when it comes to the mutual mistake of fact, they have the authority to establish and act by clear and convincing evidence, and we do not know that they did not have that very conversation. She had the right to weigh those benefits. Should I forget this, not settle, roll the dice if those events occur? But, of course, she also has to litigate the antidote to the agreement. And while we don't have the antidote to the agreement, we certainly by inference know what it says because if she renounced the loan, and when counsel says they were litigating her right to renounce the loan, it wasn't a question she can't renounce it if she chooses to do so. She receives one half of the estate with a $400,000 plus. She settles for $50,000, you know, $750 per month. But we know by influence why she did that because of the influential agreement. So, but even getting to the mutual mistake, the threshold question we believe that exists on that is the question of the statement. Every lease is a contract. A non-party does not get to set aside a contract. A party's been a contract. We found a contract, set it aside, and rescinded it. If not Adele, she's not a party to that agreement. The mutual mistake requires an unconscionable result. We think when you look at the trust, the overriding concept, one, it stays within one delineal sentence. In this instance, she claims it would be unconscionable for it to stay on the side of either the split line. We believe it might be more comfortable if it ended up with somebody who's not on the split line of currency. And lastly, I don't think you can return to the status quo because you will receive all the benefit of that deal. She can't and won't get that back. That's all part of rescinding the contract. That covers all the points that I wanted to address. If there were any questions, I would try and answer them. I don't see any additional questions at this time. Thank you. Thank you again. Any rebuttal, Mr. Radley? Thank you, Your Honor. I'd like to point out again that the cases, including the Solando case, Supreme Court case, say that the release was specifically referred to the testimony, either directly by specifically referring to it or by strong implication for it to exclude the tariffs by the testimony. In this case, there is no such reference in the settlement agreement to the testimony. The mistake that was made at the time the parties settled in 1969 was the assumption of the parties, as it appears in the correspondence, the assumption that there was no expectancy from Edith's trust. Did the parties know about the existence of Edith's trust? I am searching my memory as to what the records would show, Your Honor. Edith's trust was virtually identical to the Foti's trust. Foti's trust was in his will. So certainly the parties knew what was in Oti's trust. I believe it's in the record that Edith's trust and Oti's trust were both prepared by the same attorney. So this is not a situation where they entered into this agreement and Beulah had no clue about the existence of this trust of Edith and that if things worked out in a certain way, it could eventually go to Oti. I believe that it's not in the record, Your Honor, as to what Beulah knew and what she did not. It's not certainly not in the two letters of the record, Your Honor. It's not in the settlement documents as to what she knew. So is your position that this information was something that was kept from her and she signed this agreement not knowing about the possibility, depending on how things worked out, that this money could be funneled into Oti's estate? I don't believe that's in the record, Your Honor. I think it was kept from Beulah. I think it's circumstantially apparent from the documents in the record that the parties did not anticipate the fact that one of the evidence issues represented in the agreement would appear to have been addressed. I'd like to refer specifically to Edith's intent. In the Doctor's Associates case, we said in court very emphatically they refused to honor or uphold the release of Edith May because it was not the intent of the parties at the time. And we believe that that was the situation in this particular case. It was Edith's intent that she wanted to give the purpose of her trust to Oti and Catherine's heirs directly. In the event she had no issue during the term of the trust, we believe that that appears on page 35 of the appendix. That's part of Edith's trust where she said, in the event Oti or two children, Oti and Catherine died without leaving the heirs, because she was a determined issue, then the purpose of her trust would go directly to the heirs of Oti and the heirs of Catherine. So that shows her intent, and that is a factor when considering the equitable remedy of disregarding or setting aside the release. As to when the facts occurred, I think there was an allusion to the fact that the facts that came to light years after the settlement, it's almost always the case in the material statement of the facts of the cases. In the Augustuson case, there was the settlement of the divorce case, and that particular case, the parties. So, counsel, when you say the facts that came to light, and that gets back to my earlier question about whether or not your position was that she didn't know about this potential trust and the money coming in. So the facts that came to light are that Catherine died and Robert died and Bruce died, and the money ended up going to Oti's estate. Those are the facts that came to light. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess at this time.